# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| DETRINA SOLOMON, on behalf of herself and all others similarly situated, | Case No.: |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| FLIPPS MEDIA, INC. dba FITE and FITE TV, | <u>**JURY TRIAL DEMANDED**</u> |
| Defendant. | |

Plaintiff Detrina Solomon ("Plaintiff"), on behalf of herself and all other persons similarly situated, brings this action against Defendant Flipps Media, Inc. doing business as FITE and FITE TV ("FITE" or "Defendant"). Plaintiff makes these allegations on personal knowledge as to herself and upon information and belief as to all other matters.

## <u>NATURE OF THE ACTION</u>

1.      Plaintiff brings this consumer privacy class action on behalf of subscribers to FITE's video streaming services and purchasers of FITE's pay-per-view events who obtained specific video materials from its website and applications and had a Facebook account during the time FITE used Facebook Pixel. FITE's systematic practice of knowingly disclosing its subscribers' and purchasers' personally identifiable information ("PII") to third-party Facebook, Inc. (now known as Meta Platforms, Inc.) without their informed, written consent violates the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA" or "Act").

2.      FITE is a digital streaming company that provides subscribers to its FITE+, TrillerVerzPass, and NWA All Access channels and purchasers of its stand-alone pay-per-view events with a vast array of live and on-demand video content in the sports, entertainment, and music arenas on its website and app.

3.      Congress enacted the VPPA in 1988 to give consumers "control over personal information divulged" in exchange for "services from video tape service providers," S. Rep. No. 100-599, at 8, by prohibiting these providers from "knowingly disclosing" "personally identifiable information concerning any consumer." This includes "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider," without the consumer's specific and informed prior written consent. Defendant violated each element of this Act.

4.      Plaintiff and the other members of the Class (defined below) are "consumers" because they are paid subscribers to at least one of FITE's websites or purchased at least one pay-per-view event from FITE. And Defendant is a "video tape service provider" because it operates a digital video streaming subscription service that provides its subscribers and purchasers with access to video content through its websites and applications.

5.      Defendant knowingly discloses its subscribers' and purchasers' "personally identifiable information" ("PII") to Facebook through its use of the "Facebook Pixel" or "Pixel," a programming code that Facebook makes available to FITE to collect granular information about its subscribers' interactions with its websites. Facebook uses this information to build detailed profiles about FITE's subscribers and purchasers that enables FITE to serve them with targeted advertisements on Facebook and otherwise facilitates FITE's use of Facebook's advertising services.

6.      Defendant intentionally installed the Pixel and selected the specific user information the Pixel would collect from its subscribers and its purchasers and send to Facebook, including specific videos the user accessed (via the video's title and the URL for the video) and the user's unencrypted and personally and publicly identifiable Facebook ID ("FID").

7.      The FID is a unique sequence of numbers linked to an individual's Facebook profile that identifies the individual more precisely than a name or email address. Indeed, entering

"facebook.com/[FID]" into any web browser returns the Facebook profile of the specific individual. Because a user's FID uniquely and personally identifies that person's Facebook account, an unencrypted FID allows any ordinary person to quickly and easily use an unencrypted FID to locate, access, and view a particular user's Facebook profile, and all of the detailed and personal information contained in it.

8.      FITE thus discloses to Facebook through the Pixel in one transmission the following information each time a subscriber or purchaser accesses a video on its websites or applications: (1) the video's title and URL; and (2) detailed, personal information that easily identifies the subscriber or purchaser via the FID. This information constitutes PII under the VPPA.

9.      Finally, Defendant did not obtain—or even seek—the separate, informed written consent needed for it to lawfully disclose the PII of Plaintiff or any other Class member.

10.      Accordingly, Plaintiff and all similarly situated subscribers and purchasers are "aggrieved persons" under the VPPA seeking to enjoin Defendant from further unauthorized disclosures of PII; awarding actual damages no less than liquidated damages of $2,500 per violation, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest as permitted by law; and any other relief the Court deems appropriate.

## PARTIES

11.      Plaintiff Detrina Solomon ("Plaintiff") is a citizen and resident of Texas.

12.      During the two years before she filed this action, Plaintiff has had a Facebook account, subscribed to Defendant's TrillerVerzPass digital video streaming service, and used a laptop, tablet and smart phone to access streaming video content on that service.

13.      Defendant Flipps Media, Inc., doing business as FITE and FITE TV, is a Delaware corporation with its principal place of business located at 626 RXR Plaza, PO Box 1793, Uniondale, NY 11556.

14.     Founded in 2012, Defendant owns and operates an online digital streaming service that offers a wide range of video content in the sports, entertainment, and music arenas. Defendant's video streaming content is available on its website (www.fite.tv) and mobile app.

15.     Defendant is owned by Triller, Inc., a Delaware corporation with its principal place of business in Los Angeles, California. Triller acquired Defendant in July 2021.

16.     "Triller is an integrated digital technology, media and entertainment company broadly engaged in the development, production, promotion, marketing and monetization of content through its mobile app, streaming platform, and virtual and live events," as noted in the February 2022 regulatory filing. "Today, Triller has combined six companies through acquisitions," including Defendant, "to create a technology platform that enables the creation, distribution, measurement, and monetization of content that is consumed digitally, in virtual worlds and during live events in an ecosystem[.]"

## JURISDICTION AND VENUE

17.     This Court has personal jurisdiction over Defendant because its principal place of business is in New York.

18.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

19.     Venue is appropriate in this Court because Defendant resides in this District, and certain of the conduct alleged in this lawsuit occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### I.     The Video Privacy Protection Act

20.     With certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider," from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider" without first obtaining the consumer's informed, written

consent "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710.

21.     Congress passed the VPPA to protect the privacy of individuals' video rental, purchase, and viewing information, so that consumers can "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599 at 8 (1988). "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.* at 7-8.

22.     The need for the protections of the VPPA are more pronounced today than ever, given the largely unregulated, sprawling, and lucrative market for consumers' online personal data, including their video watching habits. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Patrick Leahy emphasized this point: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."

23.     Defendant knowingly deprived Plaintiff and the proposed Class members of this important right for its own profit by systematically disclosing their PII to Facebook in violation of the Act.

**II.     Plaintiff and the Other Class Members Subscribe to or Purchase Defendant's Services.**

24.     Defendant owns and operates the FITE website and applications (collectively, "website"). Defendant's website provides streaming video content to its subscribers and pay-per-view purchasers (collectively, "subscribers").

25.     To purchase a subscription and access the corresponding content, an individual turns to the "Subscriptions" button at the top of FITE's website homepage (highlighted below):



26.     Upon clicking the "Subscriptions" button, the individual is delivered to a menu of subscription channels for FITE+, TrillerVerzPass, and NWA All Access:









27.    To access video content through the FITE+ service on Defendant's website, an individual must purchase a monthly or annual subscription plan from Defendant.

28.    To access video content through the TrillerVerzPass service on Defendant's website, an individual must purchase a monthly or annual subscription plan from Defendant.

29.    To access video content through the NWA All Access service on Defendant's website, an individual must purchase a monthly subscription plan from Defendant.

30.    If an individual wants to access an individual pay-per-view event on Defendant's website that is not also available on one of the aforementioned services to which the individual already subscribes, that individual may purchase it on a stand-alone basis from Defendant's website.

31.    To purchase a subscription or a pay-per-view event, an individual must provide to Defendant certain personal information, including personally identifiable information like their name, billing address, email address, and credit card information.

32.    Defendant's subscribers and purchasers as discussed above are therefore consumers under the VPPA.

**III.    Defendant is a "Video Tape Services Provider" Because it Streams Video Content.**

33.    Defendant provides video tape services to its subscribers and purchasers by offering an array of video content on the website it owns and operates.

34.      Defendant has characterized itself as "an industry leading transactional digital live streaming platform for sports and entertainment" in a regulatory filing from early 2022. This filing further noted that "the FITE network distributes free-to-air content, pay-per-view events, and subscription videos on-demand ('SVOD'). The service offers 15,000+ hours of videos on demand and streams 1,000+ live events per year to more than 5 million registered users worldwide. Originally dedicated to combat sports (including boxing, mixed martial arts, and professional wrestling), FITE has been an industry leading global digital distributor for countless marquee events by HBO, Showtime, Fox, Top Rank/ESPN, WWE, Triller Fight Club, and more than 400 other publishers."

35.      Defendant provides streaming video content to subscribers of its FITE+, TrillerVerzPass, and NWA All Access channels and to purchasers of its stand-alone pay-per-view events on its website and app.

36.      FITE+ offers paid monthly and annual subscription plans that offer video content spanning various combat sports including boxing, mixed martial arts, grappling, and professional wrestling from numerous organizations like Top Rank Boxing, Shamrock Fighting Championships, Impact Wrestling, and Thuzio.

37.      TrillerVerzPass offers paid monthly and annual subscription plans providing access to Verzuz hip-hop battles and to TrillerVerzBoxing and Triad Combat shows featuring sporting matches combined with live musical performances.

38.      NWA All Access offers a paid monthly subscription plan that provides unlimited access to the full catalogue of this professional wrestling organization's NWA Powerr, NWA PowerrSurge, and NWA USA shows, a curated selection of past pay-per-view events, and access to its two weekly shows.

39.     Defendant also offers for purchase various stand-alone pay-per-view events, some of which also are included in its subscription channels. Among these events are the widely viewed Ric Flair's Last Match and the Jake Paul vs. Tyron Woodley boxing match.

40.     Defendant provides pre-recorded content via its online streaming services, whether or not the content is billed as "live." For "live" streaming events, video of the event is first recorded as a video file (such as in a standard RAW file format). That video file is then delivered to an encoder to convert the video into a smaller, streamable file. The smaller, streamable video files are then transmitted via the Internet to individual devices for viewing, such that end users of Defendant's website always view pre-recorded content.

41.     Defendant is a prototypical video tape service provider under the VPPA.

**IV.     Defendant Knowingly Discloses Subscribers' PII to Facebook Whenever They Access Videos on its Website.**

42.     Defendant knowingly discloses Plaintiff's and other Class members' PII to Facebook through the Pixel code it embedded on its website.

43.     The Facebook Pixel, first introduced in 2013, allows online businesses like FITE to build detailed profiles about its users by collecting information about how they interact with their websites and facilitates the service of targeted advertising to them. The Pixel commonly relays whether users initiate purchases, what items they view, and, as relevant here, the exact content accessed on a particular webpage, including specific video materials. The Pixel can do this whether or not the site's users are logged onto Facebook and even after they clear their browser histories.

44.     Defendant collects, uses and shares subscribers' personal information obtained through its websites for various marketing and advertising purposes, as demonstrated generally by provisions in its Privacy Policy.

45.     Defendant's Privacy Policy states that when individuals use its online service, "we may ask you to provide us with certain personal information that can be used to contact or identify you," including "your name, phone number and email address."

46.     The Policy states that when individuals "use the Service, [Defendant's] servers may automatically record information that your device sends," including "the webpage you were visiting or content item you were playing." It also states that Defendant "will use this information," among other things, "for advertising and other marketing purposes."

47.     The Policy states that when individuals "use third party social networking services via the Service, [Defendant] may collect the user credentials for your account which may include your name, email address, gender, user ID, list of friends, and any other information that you have chosen to make public through such services."

48.     Finally, the Policy states that Defendant "may implement or allow third-party companies to implement automatic usage tracking processes" while noting that the information collected by these tracking processes "will be used in order to improve the Service quality (for example improvement of search results and the advertising selection) and to compile usage statistics."

49.     One important tracking technology that Defendant uses to further its advertising goals—but does not disclose or discuss in its Terms of Use, Privacy Policy or any other material provided to subscribers—is the Facebook Pixel.

50.     Pixel is a unique string of code that businesses install on their websites. It places and triggers specific cookies of the businesses' choosing that track users' Internet activity and utilizes that information to build detailed user profiles. Pixel can do this whether or not the site's users are logged onto Facebook and even after they clear their browser histories.

51.     Facebook promotes the Pixel to companies like FITE as a "powerful tool" that can "help power [its] Facebook ads . . . [to] reach a more relevant audience, provide a more personalized

ad experience and optimize [its] ad campaigns towards better business outcomes." Facebook also profits from Pixel. While Facebook does not charge businesses to install the Pixel on their websites, it charges them to place the advertising that the Pixel makes possible on Facebook's platform. The Pixel is an important piece of Facebook's advertising business, which comprises 97% of the company's annual revenue and has made it the world's leading social media marketing platform. As shown below, Facebook's advertising revenues have increased significantly year after year since 2015, culminating in nearly $115 billion in worldwide revenue in 2021:



52.    To take advantage of Facebook's targeted advertising and analytical services, Defendant intentionally installed the Pixel on its websites via step-by-step instructions provided on Facebook's website.

53.    During the installation process, Defendant chose certain of a menu of available "Events" for incorporation into the Pixel installed on its website. Pixel's Events track specific information about the activity of users when they visit a company's website. One of the Events that Defendant chose for its Pixel is "PageView." PageView captures and shares the URL and title of each video a subscriber or purchaser accesses on its site, as shown in the below Pixel Helper Extension exemplar:



54.     Defendant also knew that the Pixel installed on their websites would send Facebook cookies identifying their subscribers, including unencrypted FIDs. This is demonstrated by, among other things, Defendant's indisputable familiarity with and use of identifying cookies on its website in connection with its targeted advertising efforts, and its knowledge of how the Pixel worked, *i.e.*, that the Pixel's sharing of information with Facebook enabled Defendant's websites to show targeted advertising to its digital subscribers based on the video content those subscribers had viewed on the websites.

55.     Defendant's knowledge that the Pixel on its website would send Facebook cookies personally identifying their subscribers, like the c_user cookie, is further shown by its use of in-house targetted advertising technology on all content on its website. As noted in the February 2022 regulatory filing, parent company Triller "monetize[s] its live and virtual audiences through targeted consumer engagement, content moderation, and social selling driven by AI technology developed by Amplify.ai," which Triller acquired soon after Defendant in 2021. "Amplify.ai's technology is incorporated into each piece of short-form and long-form content created within the Triller app or broader Triller ecosystem," *i.e.*, including all of Defendant's content. "As this content is shared across the internet

and other social media platforms, advertisers gain visibility and control into where, when, and how their content is positioned in order to optimize engagement and performance."

56.    An FID is a unique, personal, and persistent identifier Facebook assigns to each of its users that allows anyone to look up the user's Facebook profile to learn that person's identity. If the FIB is combined with a video title watched by that Facebook user—all of which Defendant knowingly provides to Facebook through the Pixel embedded on its websites—any ordinary person could identity a subscriber and the specific video materials that subscriber accessed on Defendant's sites.

57.    For FITE+, Defendant disclosed to Facebook the video title and FID of a FITE+ subscriber in a single transmission via the Facebook Pixel. This transmission is depicted in the following exemplar screenshot excerpt:

58.    In the graphic above, Box A shows that Pixel sent the information contained in this shot, including that which follows, to Facebook. The highlighted information in Box A shows the URL for "The Roast of Ric Flair" that was accessed on www.fite.tv, and subsequently identifies the "title" of this video. Box B identifies the subscribers' unencrypted FID as the number following the "c_user" cookie (the FID of the individual who accessed this video has been redacted for privacy reasons).

59.     The information transmitted in the above graphic is alternatively shown in the screen shot below. While the formatting is different, this graphic nonetheless demonstrates that Defendant's Pixel sent the same specific types of PII to Facebook:



60.     In this table, Box A shows that the subscriber accessed the URL of https://www.fite.tv/watch/the-roast-of-ric-flair. Box B shows that the "title" of the video is "The Roast of Ric Flair – Official Replay," and it also gives a "description" of the video. The cookies sent in this transmission, including the c_user cookie, are the same as those contained in the prior graphic.

61.     Entering the URL identified in the preceding graphics on a web browser pulls up the video.

62.     An ordinary person could identify the subscriber accessing this video by entering the unencrypted FID associated with the c_user cookie on their search bar as follows: https://www.facebook.com/[unecrypted FID]/. Doing so reveals the subscriber's Facebook profile that identifies the subscriber. This basic method of accessing a person's Facebook profile is generally and widely known among the public.

63.    An exemplar Facebook profile of the type one would see after entering a subscriber's unencrypted FID follows:



64.    For TrillerVerzPass, Defendant disclosed to Facebook the video title and FID of a TrillerVerzPass subscriber in a single transmission via the Facebook Pixel. This transmission is depicted in the following exemplar screenshot excerpt:



65.    In the graphic above, Box A shows that Pixel sent the information contained in this shot, including that which follows, to Facebook. The highlighted information in Box A shows the URL for the "TrillerVerz V" event that was accessed on www.fite.tv and subsequently identifies the full "title" of the video as "TrillerVerz V - Kovalev vs. Pulev | Cypress Hill vs. Onyx – Official Replay," followed by the full lineup of fighters and performers and the location of the event.  Box B identifies the subscribers' unencrypted FID as the number following the "c_user" cookie (the FID of the individual who accessed this video has been redacted for privacy reasons).

66.    The information transmitted in the above graphic is alternatively shown in the screen shot below. While the formatting is different, this graphic nonetheless demonstrates that Defendant's Pixel sent the same specific types of PII to Facebook:



67.    In this table, Box A shows that the subscriber accessed the URL of www.fite.tv/watch/trillerverz-v. Box B shows that the "title" of the video is "TrillerVerz V - Kovalev vs. Pulev | Cypress Hill vs. Onyx – Official Replay," and it also gives a "description" of the video by

giving the full lineup of fighters and performers along with the location of the event. The cookies sent in this transmission, including the c_user cookie, are the same as those contained in the prior graphic.

68.     Entering the URL identified in the preceding graphics on a web browser pulls up the video.

69.     For NWA All Access, Defendant disclosed to Facebook the video title and FID of an NWA All Access subscriber in a single transmission via the Facebook Pixel. This transmission is depicted in the following exemplar screenshot excerpt:

70.     In the graphic above, Box A shows that Pixel sent the information contained in this shot, including that which follows, to Facebook. The highlighted information in Box A shows the URL for "NWA, Season 4, Episode 1 – Official Replay" that was accessed on www.fite.tv and subsequently identifies the "title" of the video and provides a "description" of this "NWA Pro Wrestling" event by identifying the lineup of wrestlers and giving context.  Box B identifies the subscribers' unencrypted FID as the number following the "c_user" cookie (the FID of the individual who accessed this video has been redacted for privacy reasons).

71.     The information transmitted in the above graphic is alternatively shown in the screen shot below. While the formatting is different, this graphic nonetheless demonstrates that Defendant's Pixel sent the same specific types of PII to Facebook:

72.    In this table, Box A shows that the subscriber accessed the URL of www.fite.tv/watch/nwa-usa-s4-e1. Box B shows that the "title" of the video is "NWA USA, Season 4, Episode 1 – Official Replay" and it also gives a "description" of the video by noting the promotion, genre, airing time, and wrestler lineup, and providing additional context. The cookies sent in this transmission, including the c_user cookie, are the same as those contained in the prior graphic.

73.    Entering the URL identified in the preceding graphics on a web browser pulls up the video.

74.    Finally, for a stand-alone pay-per-view event, Defendant disclosed to Facebook the video title and FID of an individual accessing the event in a single transmission via the Facebook Pixel. This transmission is depicted in the following exemplar screenshot excerpt:



75.     In the graphic above, Box A shows that Pixel sent the information contained in this shot, including that which follows, to Facebook. Box B identifies the subscribers' unencrypted FID as the number following the "c_user" cookie (the FID of the individual who accessed this video has been redacted for privacy reasons). Box C shows the URL of a video titled "The Roast of Ric Flair" following "watch" that was accessed on www.fite.tv, along with a "description" of the video.

76.     The information transmitted in the above graphic is alternatively shown in the screen shot below. While the formatting is different, this graphic nonetheless demonstrates that Defendant's Pixel sent the same specific types of PII to Facebook:



77. In this table, Box A shows that the subscriber accessed the URL of www.fite.tv/watch/the-roast-of-ric-flair. Box B shows that the "title" of the video is "The Roast of Ric Flair – Official Replay" and it also gives a "description" of the video by noting the promotion, genre, and live air time, and briefly summarizing the event. The cookies sent in this transmission, including the c_user cookie, are the same as those contained in the prior graphic.

78. Accordingly, Defendant violates the VPPA by knowingly disclosing its subscribers' FIDs alongside the specific accessed videos to Facebook.

**V.    Defendant Discloses Subscribers' PII to Facebook Without Consent.**

79. Defendant does not request or receive separate, informed written consent when disclosing Plaintiff's or Class members' PII to Facebook, even though Defendant must obtain informed, written consent "in a form distinct from any form setting forth" the consumers' "other legal or financial obligations. *See* 18 U.S.C. § 2710(b)(2)

80. Instead, Defendant provides links to its Terms of Use and Privacy Policy, which subscribers need not click or read during the registration or purchase process.

81.    Defendant's Privacy Policy, quoted above, contains only general statements that it uses tracking technologies to collect and share certain personally identifiable subscriber or purchaser information with third parties in certain circumstances for advertising purposes. Defendant's Terms of Use provides even less information about subscribers' and purchasers' personal information and how Defendant may use it. Neither document discloses that Defendant collects and transmits the specific subscriber PII at issue herein to Facebook.

82.    Even if Defendant's Terms of Use or Privacy Policy contained the informed, written consent required under the VPPA (which it does not), it is not in a form separate and distinct from consumers' other legal and financial obligations.

83.    Moreover, Defendant does not obtain informed, written consent when it seeks to disclose consumers' PII or in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner.

84.    Defendant also does not provide consumers like Plaintiff with the opportunity – in a clear and conspicuous manner – to withdrawn consent on a case-by-case basis or to withdraw consent from ongoing disclosures at the consumers' election.

85.    Accordingly, Defendant violates the VPPA by knowingly disclosing its subscribers' PII to Facebook without consent.

## PLAINTIFF-SPECIFIC ALLEGATIONS

86.    Plaintiff has had a paid subscription to Defendant's TrillerVerzPass channel during the past two years, and she has had a Facebook account since 2009.

87.    During the two years before this action was filed, Plaintiff has used an Internet-connected laptop, tablet, and smart phone to access video content using her TrillerVerzPass subscription on Defendant's website.

88.    On information and belief, Defendant disclosed to Facebook Plaintiff's unencrypted FID along with the title and URLs of the videos she accessed on Defendant's website within the past two years on one or more occasions.

89.    Defendant did not seek or obtain Plaintiff's informed, written consent for any of the aforementioned disclosures, including in a separate and distinct form from any other document setting forth any other legal or financial obligations Plaintiff had to Defendant.

90.    Each time Defendant disclosed Plaintiff's PII to Facebook, it violated her rights under the VPPA.

## CLASS ALLEGATIONS

91.    Plaintiff brings this lawsuit under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons in the United States who subscribed to FITE's FITE+, TrillerVerzPass, or NWA All Access channels or purchased a pay-per-view event from FITE and accessed video content on FITE's website (www.fite.tv) or app while having a Facebook account.

92.    The Class Period is from September 14, 2020 to the present.

93.    Excluded from the Class is Defendant, any control person of Defendant, as well as the officers and directors of Defendant and the immediate family members of any such person. Also excluded is any judge who may preside over this cause of action and the immediate family members of any such person.

94.    Plaintiff reserves the right to modify, change, or expand the Class definition based upon information obtained in discovery or through further investigation.

95.    **Numerosity**: The Class consists of at least thousands, and likely hundreds of thousands, of ascertainable individuals, making joinder impractical.

96.    **Commonality and Predominance**: Common questions of law and fact exist concerning the Class's claim and predominate over any questions affecting only individual Class members. Questions common to the Class include:

a.    Whether Plaintiff and the Class members are "consumers;"

b.    Whether Defendant is a "video tape service provider;"

c.    Whether the information Defendant disclosed to Facebook constitutes "personally identifiable information;"

d.    Whether Defendant "knowingly disclosed" Plaintiff's and the Class members' PII to Facebook;

e.    Whether Defendant obtained "the informed, written consent" of Plaintiff and the Class members "in a form distinct and separate from any form setting forth other legal or financial obligations" of those individuals;

f.    Whether Defendant "provided an opportunity, in a clear and conspicuous manner," for Plaintiff and the Class members "to withdraw on a case-by-case basis or to withdraw from ongoing disclosures," at their "election;"

g.    Whether Plaintiff and the Class members are "aggrieved persons;"

h.    Whether Defendant's conduct violates the VPPA;

i.    Whether Defendant should be enjoined from disclosing Plaintiff's and the Class members' PII; and

j.    The extent and form of any other preliminary or equitable relief that the Court determines appropriate.

97.    **Typicality:** Plaintiff's claims are typical of the claims of the Class because Plaintiff, like all Class members, has been injured in the same way by Defendant's misconduct—disclosing consumers' PII to Facebook—and seeks the same legal relief to remedy this misconduct.

98.     **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, including data privacy cases. Plaintiff does not have any interests antagonistic to those of the Class.

99.     **Ascertainability**: The members of the Class can be readily determined through objective criteria and the utilization of data in the possession of Defendant or third-party Facebook that will identify Defendant's subscribers whose privacy rights as set forth in the VPPA were violated due to Defendant's misconduct as alleged herein.

100.    **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages and injunctive relief are essential to induce Defendant to comply with federal privacy law. Moreover, Class members are very unlikely to pursue legal redress individually for the violations detailed herein because the amount of each Class member's claim is prohibitively small relative to the complexity of the litigation, the resources necessary to effectively prosecute this action, and Defendant's significant resources. A class action will allow these claims to be brought where they would otherwise go unaddressed because of the prohibitive costs of bringing individual lawsuits. Finally, a class action would provide the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSE OF ACTION

### Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710

101.    Plaintiff incorporates and realleges the above factual allegations by reference.

102.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

103.    As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or subscriber of goods or services from a video tape service provider." Plaintiff and Class members are subscribers to or purchasers of Defendant's services that provide video content. Thus, Plaintiff and Class members are "consumers" under this definition.

104.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]" Defendant is a "video tape service provider" because it provides online video streaming services to its subscribers and purchasers.

105.    As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." Defendant disclosed Plaintiff's and Class members' "personally identifiable information"—specifically, their unencrypted FIDs and the title and URL of the videos they requested or obtained—to Facebook.

106.    This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and each Class member to Facebook as an individual who accessed Defendant's video content, including the specific video materials requested or obtained on Defendant's website. Indeed, anyone with an FID could identify the individual associated with it simply by entering "facebook.com/[FID]" into a web browser.

107.    Pursuant to 18 U.S.C. § 2710(b)(1), Defendant "knowingly" disclosed the PII of Plaintiff and the Class members because it intentionally programmed the Facebook Pixel into its website code while knowing that Facebook would receive video titles and the consumer's FID when a consumer requested or obtained a specific video.

108.    Defendant never obtained from Plaintiff or any Class member the separate and informed written consent needed to lawfully disclose their PII to a third-party pursuant to 18 U.S.C.

§ 2710(b)(2). More specifically, Defendant never obtained from Plaintiff or any Class member informed, written consent in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; Defendant never obtained from Plaintiff or any Class member informed, written consent that, at the election of the consumer, was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner; and Defendant never provided an opportunity, in a clear and conspicuous manner, for Plaintiff or any Class member to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election.

109.     By disclosing Plaintiff's and Class members' PII, Defendant violated Plaintiff's and Class members' statutorily protected right to privacy in their video-watching activity, and they are each "aggrieved persons" entitled to relief under 18 U.S.C. § 2710(c).

110.     As a result of these violations, Defendant is liable to Plaintiff and Class members.

111.     On behalf of herself and all members of the Class, pursuant to 18 U.S.C. § 2710(c)(2)(A), Plaintiff seeks to enjoin Defendant's disclosures of PII; liquidated damages in the amount of $2,500 per violation; punitive damages; reasonable attorneys' fees and costs; pre- and post-judgment interest as allowed by law; and all other preliminary or equitable relief the Court deems appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court:

i.    Certify this case as a class action, and appoint Plaintiff as Class Representative and the undersigned attorneys as Class Counsel;

ii.   Enter judgment in favor of Plaintiff and the Class;

iii.  Enjoin Defendant's future disclosures of Plaintiff's and Class members' PII;

iv.   Award Plaintiff and Class members actual damages but not less than liquidated damages in an amount of $2,500 per violation;

v.    Award Plaintiff and Class members punitive damages;

vi.   Award Plaintiff and Class members reasonable attorneys' fees and other litigation costs reasonably incurred;

vii.  Award Plaintiff and Class members pre- and post-judgment interest as provided by law; and

viii. Award such other preliminary and equitable relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable as of right.

Dated: September 14, 2022

Respectfully submitted,

Nicomedes Sy Herrera (SBN 2925402)
HERRERA KENNEDY LLP
80 Pine Street, 33d Floor
New York, NY 10005
(510) 422-4700
NHerrera@HerreraKennedy.com

Shawn M. Kennedy
HERRERA KENNEDY LLP
4590 MacArthur Blvd., Suite 500
Newport Beach, CA 92660
Tel: (949) 936-0900
skennedy@herrerakennedy.com

Christopher J. Cormier
BURNS CHAREST LLP
4725 Wisconsin Avenue, NW
Washington, DC 20016
Tel: (202) 577-3977
ccormier@burnscharest.com

Hannah Crowe
Lauren Cross
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Tel: (469) 904-4550
hcrowe@burnscharest.com
lcross@burnscharest.com

*Attorneys for Plaintiff and the Proposed Class*

28